UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| DeAUNTE' CARTER | ) |
| | ) |
| v. | ) No. 3:13-01243 |
| | ) JUDGE CAMPBELL |
| | ) |
| UNITED STATES OF AMERICA | ) |

MEMORANDUM

I. Introduction

Pending before the Court is a Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, Or Correct Sentence (Docket Nos. 1, 9), filed by the Movant/Petitioner, pro se. The Government has filed a Response (Docket No. 40) to the Motion.

For the reasons set forth herein, the Petitioner's Motion To Vacate (Docket Nos. 1, 9) is DENIED, and this action is DISMISSED.

II. Procedural and Factual Background

In the underlying criminal case, Petitioner pled guilty, pursuant to a Plea Agreement, to assault of a federal officer or employee, in violation of 18 U.S.C. §§ 111(a), (b) (Count One); attempted robbery affecting commerce, in violation of 18 U.S.C. § 1951 (Count Two); and using, carrying, and brandishing a firearm, in violation of 18 U.S.C. § 924(c)(1)(A). (Docket Nos. 16, 104, 142 in Case No. 3:10-00141). Through the Plea Agreement, the parties agreed to a total sentence of 300 months imprisonment, and to the dismissal of Count Three, which charged another violation of 18 U.S.C. § 924(c)(1)(A). (Id.) The parties also waived certain appeal rights. (Id.) At the subsequent sentencing hearing, the Court sentenced the Petitioner to the agreed 300-month custodial sentence. (Docket Nos. 116, 117, 141 in Case No. 3:10-00141).

Petitioner's two Co-Defendants, Rory Lamont Gilmer, II and Antonio T. Leggs, also pled guilty to Counts One, Two and Four through similar plea agreements, but they did not agree to a specific sentence. (Docket Nos. 102, 103, 142 in Case No. 3:10-00141).

The following facts appear in the Plea Agreement, and were admitted by the Petitioner at the change of plea hearing:

> (a) On March 25, 2010, shortly after 2:00 a.m., CST, the two (2) law enforcement officers, hereafter referred to as MP and JF, were conducting an investigation as part of a larger investigation being conducted by the Drug Enforcement Administration ('DEA') at the Hyatt Place Hotel. . .
>
> On the referenced date and time, MP and JF walked into the Hyatt Place Hotel, whereupon they observed a female employee whom they believed to be night manager of the hotel in a small room located off the lobby. As the officers approached the employee, who had gestured for them to come to her location, they encountered three (3) subjects wearing masks and black clothing. The subjects demanded money from the officers, and one of the subjects pointed a handgun in the face of MP. MP and JF were ordered to the floor. MP was kicked and struck by the subject several times. JF was struck in the face by one of the subjects. During the time of the assault, one of the subjects took the hotel employee to a desk and made her open the cash drawer, but no money was ultimately taken.
>
> During the incident, JF heard the subjects talking about shooting them. As a result, JF acted as if he was going to sit in a chair and then retrieved a handgun from his side. In fear for his life and for the life of MP, as well as the hotel employee, JF fired in the direction of all three (3) subjects.
>
> After several shots were fired by JF, all three (3) subjects fled the hotel without retrieving any United States Currency from the cash drawer or from the officers. MP and JF pursued the subjects to the parking lot and were able to observe a van exiting the parking lot.
>
> MP and JF followed the van from the hotel to Interstate 65 North, called the MNPD for assistance, and then returned to the hotel to check on the welfare of the hotel employee. JF provided a description of the vehicle and the direction of flight. Shortly thereafter, MNPD officers spotted and stopped the vehicle at Interstate 65 near Wedgewood Avenue in Nashville.
>
> The MNPD stopped the van and located three (3) occupants, identified as

RORY LAMONT GILMER, II, ANTONIO T. LEGGS, and DEAUNTE D. CARTER. All three subjects had sustained gunshot wounds and were subsequently transported to Vanderbilt Medical Center.

Subsequent investigation by the MNPD, resulted in the recovery of a Raven .25 caliber handgun left at the Hyatt hotel and believed to be used in the assault and attempted aggravated robbery of MP and JF. The gun, which was loaded, was found lying on the floor of the hotel lobby where the incident occurred. A .25 caliber magazine was located at the scene where GILMER, LEGGS and CARTER were arrested.

On March 26, 2010, Federal Bureau of Investigation (FBI) Special Agent Eric Brown and Mark Shafer interviewed GILMER at Vanderbilt Medical Center. After being advised of his *Miranda* Rights, Gilmer agreed to speak with investigators concerning the incident at the Hyatt Hotel. GILMER advised, in substance and in part, that during the early morning hours of March 25, 2010, GILMER was with CARTER and LEGGS. The three were riding in GILMER's purple colored van. GILMER advised that each of the three were in need of money and GILMER needed money for rent. CARTER drove the van and they went to the Hyatt Hotel with the intent to rob the hotel, according to GILMER. When they arrived at the hotel, CARTER parked the van on the side of the hotel. Before the three got out of the van, GILMER advised that each put on a mask, which he described as a 'hair thing' that is of a thinner material than a ski mask. CARTER also handed GILMER a handgun before they got out of the van.

When GILMER entered the hotel, he saw two or three guys and a woman near the lobby area. GILMER told the individuals to get on the ground and empty their pockets. GILMER stated he pointed the handgun at the chest area of one of the males as he made the demand. GILMER further advised that he intended to rob the hotel, but that he did not want to hurt anyone. As he was pointing the gun, GILMER recalled that CARTER was checking the pockets of the others and LEGGS was going to the get the money. GILMER advised that they did not make it to the cash register before he heard gunshots, at which time GILMER, CARTER, and LEGGS fled from the hotel into the van.

On March 26, 2010, FBI SA Eric Brown and Mark Shafer also interviewed LEGGS at General Hospital. After being advised of his *Miranda* Rights, LEGGS agreed to speak with investigators regarding his involvement at the Hyatt Hotel. LEGGS advised, in substance and in part, that on the night in question he, CARTER, and GILMER went to the Hyatt Place Hotel. CARTER was driving GILMER's purple van. LEGGS advised that he could not remember who said go to the hotel and that they did not talk about it, but rather just went. Before they got out of the van they decided to rob the hotel. They parked on the side of the hotel and entered through a side door. LEGGS advised he was the last person to

3

go inside. He believed someone had a gun, but stated that he did not.

When LEGGS entered the hotel he saw people walking into the hotel, who he believed was a guy and two girls. He took off running back to the door because he did not want the people to see him, but, after realizing no one else was running, he came back inside. LEGGS advised he could see CARTER and GILMER in a side room of the lobby. LEGGS advised he grabbed a lap top (computer) that was in the side room. The guy in the side room then began firing at him, and he was struck in the arm and back. They all three were shot and ran from the hotel to the van. LEGGS advised the decision to go to the Hyatt Hotel was based on their need for money. LEGGS explained that they were going out out of town to Atlanta and specifically needed cash.

Both GILMER and LEGGS admitted to participating in another armed robbery, along with CARTER, of citizens walking on the street in downtown Nashville prior to the Hyatt Place robbery.

Investigating agents interviewed the General Manager of the Hyatt Place Hotel. He advised in relevant part that the hotel had approximately 120 rooms booked the night of the incident and estimated that approximately 75% of the guests at the hotel were from out of state. The GM advised that a lot of the hotel's clientele are corporate travelers from out of state. The GM further advised that most of the food and beverage utilized at the hotel, and for which the hotel remits payment, originates from U.S. Food in Charlotte, North Carolina. The corporate office for the Hyatt Hotels (parent corporation) is based in Chicago, Illinois. Payments are remitted from the hotel to the corporate headquarters. Hyatt Place Hotels has hotels nationally.

All of the aforementioned events occurred in Nashville, Davidson County, located in the Middle District of Tennessee.

(b)   Defendant, for purposes of determining the applicable advisory sentencing range under the United States Sentencing Guidelines (hereinafter 'U.S.S.G.') and pursuant to U.S.S.G. § 1B1.2, stipulates to having committed the following additional offense(s):

On March 20, 2010, three male blacks, armed with a handgun, walked into the Baskin Robbins at 850 Hillwood Boulevard in Nashville. The robbery was captured on the surveillance video. The suspects, identified as CARTER, LEGGS, and GILMER, entered the store, at which time one of the suspects, LEGGS, jumped over the counter and emptied the cash out of the cash register. CARTER took the owner/clerk, PB, to the back of the store and proceeded to duct tape her torso and face. The suspects took the register drawer containing cash, as well as cash from PB's purse, and fled the location. At the time of the robbery, Baskin

4

Robbins, which received products sold in the store from out of state, engaged in business affecting interstate commerce.

On February 17, 2010, a Cellular Renewal store located at 4336 Kenilwood Drive in Nashville was robbed by three black males armed with a handgun. The suspects, identified as CARTER, LEGGS, and GILMER, ordered the two store employees, RS and AC, to lie on the ground and proceeded to take wallets and cell phones from the victims. The suspects then broke the glass on two display cases and took more than 20 cell phones. The merchandise the suspects took from the store was valued at approximately $4,000.00. At the time of the robbery, Cellular Renewal, which received products sold in the store from out of state, engaged in business affecting commerce.

Both GILMER and LEGGS admitted to investigators to committing the Baskin Robbins and Cellular Renewal robberies, along with CARTER.

(Docket No. 104, at 5-10, in Case No. 3:10-00141; Docket No. 142, at 28-37, in Case No. 3:10-00141). At the time of the robberies described above, the Petitioner was on probation for Facilitation to Commit Aggravated Robbery arising out of an armed carjacking. (Docket No. 141, at 5, 19, in Case No. 3:10-00141).

### III. Analysis

A. The Petitioner's Claims

The Petitioner claims that his conviction and sentence should be vacated because the Government failed to disclose favorable evidence, and because he received the ineffective assistance of counsel.

B. The Section 2255 Remedy

Section 2255 provides federal prisoners with a statutory mechanism by which to seek to have their sentence vacated, set aside or corrected.[1] The statute does not provide a remedy,

---

[1] 28 U.S.C. § 2255 states, in part:

A prisoner in custody under sentence of a court established by Act

however, for every error that may have been made in the proceedings leading to conviction. "'To warrant relief under section 2255, a petitioner must demonstrate the existence of an error of constitutional magnitude which had a substantial and injurious effect or influence on the guilty plea or the jury's verdict.'" Humphress v. United States, 398 F.3d 855, 858 (6th Cir. 2005)(quoting Griffin v. United States, 330 F.3d 733, 736 (6th Cir. 2003)).

An evidentiary hearing is not required if the record conclusively shows that the Petitioner is not entitled to relief. 28 U.S.C. § 2255(b); Ray v. United States, 721 F.3d 758, 761 (6th Cir. 2013); Arredondo v. United States, 178 F.3d 778, 782 (6th Cir. 1999). No hearing is required "if the petitioner's allegations 'cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.'" Id. Where the same judge considering the Section 2255 motion also presided over the underlying criminal proceedings, the judge may rely on his own recollection of those proceedings. Blackledge v. Allison, 431 U.S. 63, 97 S.Ct. 1621, 1629 n.4, 52 L.Ed.2d 136 (1977); Ray, 721 F.3d at 761.

The Court has reviewed the pleadings, briefs, transcripts, and records filed in Petitioner's underlying criminal case, as well as the pleadings, briefs, transcripts, and records filed by the parties in this case. The Court finds it unnecessary to hold an evidentiary hearing because these records conclusively establish that Petitioner is not entitled to relief on the issues raised.

---

> of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

C. Failure to Disclose Favorable Evidence

Petitioner argues that the Government obtained his conviction through an unconstitutional failure to disclose a video that showed the Petitioner did not have a firearm and did not commit the assault with which he was charged. According to the Petitioner, Co-Defendant Gilmer had the firearm and committed the assault. The Government contends, on the other hand, that it provided the defense a copy of the Hyatt video surveillance footage as part of the discovery in the case, and has filed a copy of the prosecutor's letter to the defense documenting that fact. (Docket No. 40-2).

In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court imposed a constitutional obligation on the prosecution in a criminal case to disclose to the defendant all exculpatory and impeachment evidence. See, e.g., Robinson v. Mills, 592 F.3d 730, 735 (6th Cir. 2010). To establish a Brady violation, the defendant must show: (1) that the evidence in question is favorable; (2) that the government suppressed the relevant evidence, either purposefully or inadvertently; and (3) that the government's actions resulted in prejudice. Id.

The Petitioner does not further identify the video he claims was not disclosed by the Government, and does not explain how he is aware of what it depicts if it was not disclosed. Even assuming the failure to disclose occurred, however, the Petitioner has not shown that such non-disclosure resulted in prejudice because the facts described by the Petitioner as appearing on the video were not in dispute in the underlying criminal proceeding. As discussed above, the Petitioner and Co-Defendants Gilmer and Leggs all admitted that Co-Defendant Gilmer carried the firearm, and that the Petitioner handed it to Co-Defendant Gilmer before the three men entered the hotel to commit the robbery. (Docket No. 142, at 28-37, 38-41, 76-82, in Case No.

7

3:10-00141).

Despite Petitioner's argument to the contrary, those facts did not affect the Petitioner's criminal responsibility for the offenses to which he pled guilty, as discussed by the Court and counsel at the change of plea hearing:

> THE COURT: Okay. Now, I've got one question about the factual context, which is regarding Count 4, which is the 924(c) count dealing with a mandatory seven-year consecutive sentence. As I understand the facts that are in all these draft plea agreements, Mr. Gilmer possessed the firearm and that Mr. Carter gave the firearm to him at some point.
>
> So it appears that Mr. Carter knew that Mr. Gilmer had the firearm and for the purpose, but that Mr. Carter was not carrying or discharging the firearm in the events in question. Is that your understanding of the plea agreement?
>
> MR. CARTWRIGHT [Petitioner's trial counsel]: Yes.
>
> THE COURT: All right. So my question for you, on Count 4, is the plea of guilty based on Section 2 of Title 18?
>
> MR. CARTWRIGHT: It is, sir.
>
> THE COURT: Aiding and abetting?
>
> MR. CARTWRIGHT: Yes, sir.
>
> THE COURT: Okay. All right. I just wanted to make sure we were clear on that so I could advise Mr. Carter appropriately. Mr. Wehby, do you agree?
>
> MR. WEHBY: I do, Your Honor.

(Docket No. 142, at 6-7, in Case No. 3:10-00141).

All of the offenses to which the Petitioner pled guilty included an aiding and abetting charge under 18 U.S.C. § 2. Section 2 provides that an aider and abettor is punishable as a principal in the substantive crime. As the Court explained at the change of plea hearing, in order to be convicted as an aider and abettor under Section 2, the Government must prove the

following elements: (1) the substantive crime was committed; (2) the defendant helped to commit the crime or encouraged someone else to commit the crime; and (3) the defendant intended to help commit or encourage the crime. United States v. Donovan, 539 F. App'x 648, 656, 2013 WL 4792866 (6th Cir. Sept. 9, 2013). In order to aid and abet the commission of a Section 924(c) offense, the Supreme Court recently held that the Government must additionally prove that the defendant actively participated in the underlying crime with advance knowledge that a confederate would use or carry a gun during the crime's commission. Rosemond v. United States, ___ U.S. ___, 134 S.Ct. 1240, 1243, 1249-50, 188 L.Ed.2d 248 (2014).

All of these elements were satisfied by the facts the Petitioner admitted at the change of plea hearing.[2] The elements of the offenses to which the Petitioner pled guilty did not require that he hold a firearm during the events in question.[3]

As the Petitioner has failed to demonstrate prejudice from the alleged non-disclosure of the video, the Brady claim is without merit.

D. Ineffective Assistance of Counsel

In order to prevail on an ineffective assistance of counsel claim, the burden is on the Petitioner to show: (1) trial counsel's performance was not within the range of competence

---

[2] Although Rosemond was decided after the conclusion of Petitioner's criminal case, the facts the Petitioner admitted at the change of plea hearing, including the fact that he provided a handgun to Co-Defendant Gilmer before they entered the hotel to commit the robbery, satisfies the Rosemond "advance knowledge" requirement.

[3] Petitioner does not explain why he believes the video shows he is innocent of the assault charge. As the Court explained to Co-Defendant Leggs at the change of plea hearing, a conviction for assault of a federal officer or employee in violation of 18 U.S.C. § 111 does not require that a defendant actually touch the victim. (Docket No. 142, at 76-82, in Case No. 3:10-00141). See United States v. Chambers, 195 F.3d 274, 277 (6th Cir. 1999)(Proof of actual physical contact is not required for a conviction under Section 111).

9

demanded of attorneys in criminal cases; and (2) actual prejudice resulted from the deficient performance. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); Cullen v. Pinholster, 131 S.Ct. 1388, 1403 (2011); Campbell v. United States, 364 F.3d 727, 730 (6th Cir. 2004).

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." Strickland, 104 S.Ct. at 2052; Ludwig v. United States, 162 F.3d 456, 458 (6th Cir. 1998). In analyzing trial counsel's performance, the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 104 S.Ct. at 2065.

In order to establish prejudice, the petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id., at 2068.

Petitioner first claims that trial counsel was ineffective for failing to "file proper motions or complaints" and to request suppression, Franks, or other pretrial hearings. (Docket No. 1, at 4). Petitioner does not specify the motions trial counsel should have filed or the evidence he believes should have been suppressed, nor does he specify on what basis trial counsel should have sought a hearing or other relief. Conclusory, unsupported allegations are legally insufficient to support a motion to vacate. See, e.g., McConnell v. United States, 162 F.3d 1162, 1998 WL 552844 (6th Cir. Aug., 10, 1998). Accordingly, the Court concludes that this claim is without merit.

Petitioner also claims that trial counsel coerced and forced him to accept the agreed

settlement. Petitioner states that counsel told him that "I would get 50 plus years & my co-defendants would be used against me." (Docket No. 1, at 4). Petitioner states that he was battling stress, anxiety and depression at the time in question, and was under the care of a psychiatrist. (Docket No. 9, at 4).

Petitioner's allegations of coercion and confusion are undermined by the record. At the change of plea hearing, the Court advised the Petitioner about the elements of the offenses to which he was offering to plead guilty and the statutes cited in the Indictment; the rights he was waiving by pleading guilty; the maximum possible penalty and the mandatory minimum sentence for the offenses at issue; the sentence agreed to by the parties; the sentencing process; and each provision of the Plea Agreement. (Docket No. 142 in Case No. 3:10-00141). The Court specifically asked the Petitioner about possible coercion or confusion:

> THE COURT: . . . Mr. Carter, do you feel like you understand your plea agreement?
>
> DEFENDANT CARTER: Yes, sir.
>
> THE COURT: Do you have any questions for me about it?
>
> DEFENDANT CARTER: No, sir.
>
> THE COURT: Has anybody forced you to plead guilty?
>
> DEFENDANT CARTER: No, sir.
>
> THE COURT: Has anybody put any pressure on you in any way to make you plead guilty?
>
> DEFENDANT CARTER: No, sir.
>
> THE COURT: Are you taking any prescription medications?
>
> DEFENDANT CARTER: Yes, sir.

| | |
|---|---|
| THE COURT: | Either for which medical condition or what medications are you taking? |
| MR. CARTWRIGHT: | Your Honor, if I may, he's taking some treatment for an infection that doesn't affect his clarity of thought. And he is taking some depression medication. Do you remember the name of the medication? |
| DEFENDANT CARTER: | Celexa. |
| THE COURT: | When you take those medications, do they affect your ability to think clearly? |
| DEFENDANT CARTER: | No, sir. |
| THE COURT: | Is your mind clear? |
| DEFENDANT CARTER: | Yes, sir. |
| THE COURT: | Do you know what you're doing? |
| DEFENDANT CARTER: | Yes, sir. |
| THE COURT: | Are you having any trouble understanding me? |
| DEFENDANT CARTER: | No, sir. |
| THE COURT: | Has anybody offered you anything of benefit to encourage you to plead guilty? |
| DEFENDANT CARTER: | No, sir. |
| THE COURT: | Are you acting voluntarily? |
| DEFENDANT CARTER: | Yes, sir. |
| THE COURT | As I indicated earlier, there was a witness presented to give facts under oath. And if I understand your prior testimony, what the witness said about your conduct is correct; is that correct: |
| DEFENDANT CARTER: | Yes, sir. |

| THE COURT: | Are you offering to plead guilty because you're, in fact, guilty as charged in Counts 1, 2 and 4? |
| --- | --- |
| DEFENDANT CARTER: | Yes, sir. |

(Docket No. 142, at 63-65, in Case No. 3:10-00141).[4]

Petitioner also indicated that he was satisfied with his lawyer, and had no complaints about him. (Docket No. 142, at 53, in Case No. 3:10-00141). The Court notes that Petitioner also raised no complaint about counsel, or coercion or confusion, at the sentencing hearing when given the opportunity to address the Court. (Docket No. 141 in Case No. 3:10-00141).

As for Petitioner's allegation that counsel told him he was facing a sentence of over 50 years, and that his Co-Defendants could testify against him, he has not demonstrated that such statements were inaccurate. Through the Plea Agreement, the Government agreed to dismiss Count Three, which alleged a violation of 18 U.S.C. § 924(c)(1)(A). (Docket No. 104 in Case No. 3:10-00141). As the Court noted at the sentencing hearing, had the Petitioner been convicted of all four offenses in the Indictment, the first conviction under Section 924(c)(1)(A) carried a mandatory, consecutive seven-year sentence, and the second conviction under Section 924(c)(1)(A) carried a mandatory, consecutive 25-year sentence. (Docket No. 141, at 5-6, 18, in Case No. 3:10-00141). By entering into the Plea Agreement, the Petitioner also avoided a superseding indictment adding Section 924(c) charges carrying consecutive 25-year terms for the armed robberies of the Baskin Robbins and Cellular Renewal stores. Thus, absent the Plea

---

[4] The Court also notes that prior to the change of plea hearing, the Court granted a motion, filed by Petitioner's trial counsel, requesting a mental evaluation for the Petitioner. (Docket Nos. 54, 63, 64 in Case No. 3:10-00141). Upon conclusion of the evaluation, the examiner reported that the Petitioner was competent to proceed, and the Petitioner did not contest that finding. (Docket Nos. 72, 79 in Case No. 3:10-00141).

Agreement, the Petitioner could have ultimately been subject to a sentence in excess of 50 years. In addition, both Co-Defendants Gilmer and Leggs gave statements to police after their arrest, and it was not unreasonable for counsel to assume that they would have testified against the Petitioner had he gone to trial. Accordingly, the Court concludes that assuming trial counsel made the statements Petitioner attributes to him, Petitioner has not demonstrated that such statements were inaccurate or otherwise demonstrate ineffective assistance.

Finally, Petitioner claims that he was denied his right to appeal because: "My lawyer told me I had lost all appeal rights, except for 2255, 2241, 3582." (Docket No. 1, at 4).[5] Again, to the extent trial counsel made such a statement, Petitioner has not shown that it was inaccurate. In entering into the Plea Agreement, the Petitioner and the Government waived the right to appeal imposition of the 300-month sentence. (Docket No. 104, at 13-14, in Case No. 3:10-00141). Petitioner retained his rights to bring a collateral attack for claims of involuntariness, prosecutorial misconduct or ineffective assistance of counsel in a case brought under 28 U.S.C. §§ 2255 and/or 2241, and 18 U.S.C. § 3582(c). (Id.) The Court specifically explained the right to appeal and the waiver provision of the Plea Agreement to the Petitioner at the change of plea hearing and the sentencing hearing, and the Petitioner made a voluntary, fully informed decision to accept that provision. (Docket No. 141, at 23, in Case No. 3:10-00141; Docket No. 142, at 61-62, in Case No. 3:10-00141). Assuming trial counsel made the statement Petitioner attributes to him regarding appeal rights, Petitioner has not shown that such a statement was inaccurate or

---

[5] The Government has filed the Affidavit of Mr. Cartwright, in which he details his representation of the Petitioner, including his consultation with the Petitioner regarding a possible appeal. (Docket No. 40-1). However, the Court finds it unnecessary to rely on counsel's affidavit to resolve Petitioner's claim for the reasons set forth above.

otherwise demonstrates ineffective assistance.[6]

## IV. Conclusion

For the reasons set forth herein, the Court concludes that the Petitioner's Motion To Vacate should be denied, and this action dismissed.

Should the Petitioner give timely notice of an appeal from this Memorandum and Order, such notice shall be treated as a application for a certificate of appealability, 28 U.S.C. 2253(c), which will not issue because the Petitioner has failed to make a substantial showing of the denial of a constitutional right. Castro v. United States, 310 F.3d 900 (6th Cir. 2002).

It is so ORDERED.

*Todd Campbell*
TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE

---

[6] Petitioner makes no claim that he specifically instructed trial counsel to file an appeal, or that trial counsel failed to consult with him about the issue. See Roe v. Flores-Ortega, 528 U.S. 470, 120 S.Ct. 1029, 1035, 145 L.Ed.2d 985 (2000).